**In re Marriage of Emmanuel J. OTIS, Respondent,**

v.

**Georgia Contos OTIS, Appellant.**

**No. 49836.**

Supreme Court of Minnesota.

Oct. 3, 1980.

Rehearing Denied Nov. 25, 1980.

Cox & Goudy, Minneapolis, for appellant.

Norman L. Newhall, Minneapolis, for respondent.

Considered and decided by the court en banc without oral argument.

TODD, Justice.

Emmanuel and Georgia Contos Otis' marriage was terminated by divorce. Georgia Otis has appealed from that portion of the decree which terminates her maintenance after four years. We affirm.

The parties were married on June 6, 1954. At the time of the marriage, Mrs. Otis was a skilled executive secretary, earning a substantial income. She left her employment to give birth to the parties' only child and has remained absent from the employment market since that time. Mr. Otis has achieved a high degree of success in the business world and is employed by Control Data Corporation as an executive vice president. At the time of the divorce, Mrs. Otis was 45 and Mr. Otis was 46 years of age.

The divorce decree divided the property of the parties as follows:

<u>Mrs. Otis</u>

| | |
|---|---|
| Household furniture | $13,000.00 |
| Clothing, jewelry, etc. | 9,000.00 |
| Interest in real estate partnership | 25,000.00 (cost) |
| Equity in leased automobile | 1,000.00 |
| Cash | 21,400.00 (net) |
| Equity in homestead | 35,000.00 |
| Control Data stock (2,923 shares) | 121,304.50 |
| | $225,704.50 |

<u>Mr. Otis</u>

| | |
|---|---|
| Household furniture | $ 13,000.00 |
| Clothing, jewelry, etc. | 2,500.00 |
| Interest in real estate partnership | 25,000.00 (cost) |
| Porche automobile | 10,000.00 |
| Cash | 7,500.00 |
| Profitsharing plan—cash value | 1,300.00 |
| Life insurance policies— cash value | 20,000.00 |
| Control Data stock (6,827 shares) | 131,320.50 (net |
| | $210,620.50 value) |

Mr. Otis was also awarded his substantial interest in his vested pension plan. In addition, he was awarded property in Greece valued at $85,000 which he had inherited.

At the time of the divorce, Mr. Otis received an annual salary in excess of $120,000, plus bonuses. The trial court found that Mrs. Otis was in good health and had held a highly paid secretarial job in the past. Further, the court found that Mrs. Otis, with some additional training, is capable of earning $12,000 to $18,000 per year.[1]

In addition to the property settlement outlined above, Mrs. Otis was awarded as "alimony" the sum of $2,000 per month, commencing December 1, 1978, through and until the last day of 1980, and $1,000 per month, commencing on January 1, 1981, through and until the last day of 1982. Thereafter, no further "alimony" must be paid.

The only issue presented by this appeal is the correctness of the trial court's order terminating monthly payments to the wife after four years.

This case was submitted to the trial court in 1978. The 1978 Minnesota Legislature adopted substantial legislative changes relating to the entire subject of domestic relations. Act of Apr. 5, 1978, ch. 772, 1978 Minn. Laws at 1062. The effective date of this legislation was March 1, 1979. *Id.* 1978 Minn. Laws 1088, § 64. The parties to this action agree that the matter was decided under the principles of law established by the 1978 legislation and that this court should interpret 1978 Minn. Laws, ch. 772, in determining the validity of the trial court's order.

We have not had occasion previously to interpret 1978 Minn. Laws, ch. 772. The pertinent sections of the statute to be considered in this case involve the payment of money to a former spouse following termination of the marriage. Initially, we observe the substantial change in language defining such payments. Minn. Stat. § 518.54 (1976) was a definitional section.

Included therein was a definition of the term "alimony." As amended by 1978 Minn. Laws, ch. 772, the term "alimony" no longer appears in the statute. The term "maintenance" has been substituted without a substantial change in the definition. The elimination of the term "alimony" is effectuated throughout the entire text of 1978 Minn. Laws, ch. 772.

The grounds for awarding "maintenance" were established by 1978 Minn. Laws, ch. 722, § 51 (now codified as Minn. Stat. § 518.552 (1978 & Supp.1979)), which provides:

Subdivision 1. In a proceeding for dissolution of marriage or legal separation, or in a proceeding for maintenance following dissolution of the marriage by a court which lacked personal jurisdiction over the absent spouse and which has since acquired jurisdiction, the court may grant a maintenance order for either spouse if it finds that the spouse seeking maintenance:

(a) Lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, especially during a period of training or education, and

(b) Is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.

Subd. 2. The maintenance order shall be in amounts and for periods of time as the court deems just, without regard to martial misconduct, and after considering all relevant factors including:

(a) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

1. The parties have agreed to submit this case without a transcript. Therefore, we are bound to accept this finding of the trial court since

there is no factual basis to declare it clearly erroneous.

(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(c) The standard of living established during the marriage;

(d) The duration of the marriage;

(e) The age, and the physical and emotional condition of the spouse seeking maintenance; and

(f) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

This section is taken in large part from the Uniform Marriage and Divorce Act and we find commentaries and decisions of other jurisdictions involving this Uniform Act provision and similar provisions instructive.

The basic additudinal change reflected in the new provision has been summarized as follows:

In recent years, courts have retreated from traditional attitudes toward spousal support because society no longer perceives the married woman as an economically unproductive creature who is "something better than her husband's dog, a little dearer than his horse." Traditionally, spousal support was a permanent award because it was assumed that a wife had neither the ability nor the resources to become self–sustaining. However, with the mounting dissolution rate, the advent of no–fault dissolution, and the growth of the women's liberation movement, the focal point of spousal support determinations has shifted from the sex of the recipient to the individual's ability to become financially independent. This change in focus has given rise to the concept of rehabilitative alimony, also called maintenance, spousal support, limited alimony, or step–down spousal support.

*Rehabilitative Spousal Support: In Need of a More Comprehensive Approach to Mitigating Dissolution Trauma,* 12 U.S.F.L.Rev. 493, 494–95 (1978) (footnote omitted).

The Missouri Court of Appeals expressed the concerns concisely:

The most that can be accurately said about the amount to be granted is that it is neither the policy of the law to give the spouse receiving maintenance a lifetime annuity nor to reduce her to menial labor to eke out an existence.

*In re Marriage of Schulte,* 546 S.W.2d 41, 49 (Mo.App.1977).

The Florida Court of Appeals, which has had various occasions to consider alimony questions, has adopted an approach similar to that of the Uniform Act. The court has recognized the distinction between permanent alimony and rehabilitative alimony (maintenance):

Under the circumstances, the trial court erred in awarding permanent rather than rehabilitative alimony. As we have previously stated: "The public policy under the new law which the legislature passed and which therefore we must apply seems to be that if the spouse has the capacity to make her own way through the remainder of her life unassisted by the former husband, then the courts cannot require him to pay alimony other than for rehabilitative purposes." (*Roberts v. Roberts,* Fla.App. 1st 1973, 283 So.2d 396, 397); * * *.) The public policy of the State would be utterly frustrated by an award of permanent alimony where it affirmatively appears that the wife has not only the capacity but also the desire to be self–supporting.

*Cann v. Cann,* 334 So.2d 325, 330 (Fla.App. 1976) (citations omitted). More recently that court emphasized, in setting aside a 20–year award of alimony, that rehabilitative alimony must be of reasonable duration:

Rehabilitative alimony is not a substitute for either unemployment compensation or retirement benefits. The award is clearly an incentive to assist one in reclaiming employment skills outside the home which have atrophied during the marital relationship. It was not meant to remove the recipient from the job market. In *Manning v. Manning,* 353 So.2d 103 (Fla. 1st DCA 1977) we stated that when a wife has completed her maternal role,

and provided she is in good health, she should make every effort to rehabilitate herself within a reasonable time thereafter, and when she has done so, rehabilitative alimony is to be discontinued.

*Robinson v. Robinson,* 366 So.2d 1210, 1211–12 (Fla.App.1979). The Florida Court has also indicated that a substantial difference in the earning capacities of the spouse does not justify continuing alimony once a spouse has become self–supporting:

In view of the foregoing, under the applicable law the ability of the husband to pay does not justify continuation of the alimony where, as here, the rehabilitated wife is shown to have become self–supporting.

*Anderson v. Anderson,* 333 So.2d 484, 487 (Fla.App.1976).

We are now faced in Minnesota with new legislation which effects a substantial change in the role of the courts in awarding periodic or lump–sum payments to a divorced spouse. Minnesota decisions decided prior to this time provide only minimal help in passing on the validity of trial court awards under the new act.[2] Rather, the focus of this court must now be on a determination of the two basic standards established by the new legislation; namely, we must determine if the spouse seeking maintenance–

(a) Lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, especially during a period of training or education, and

(b) Is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.

In construing the Uniform Act provision, the Kentucky Court of Appeals concluded that the statute required satisfaction of the conditions of both subsections. *Inman v. Inman,* 578 S.W.2d 266 (Ky.App.1979). Applying these standards to the findings of

the trial court which we are bound to accept in the absence of a transcript, we conclude that the decision of the trial court is not clearly erroneous.

Affirmed.

OTIS, Justice (dissenting).

In this decision, the majority applies a section of the Minnesota session laws, Minn. Stat. § 518.552, (1978) which was not effective until after this case was tried and then holds that it dictates that appellant who has not held a job outside her home for 23 years, may be denied all alimony after only four years have elapsed. In my opinion it is manifestly unjust and inappropriate to deprive a wife of an expectancy on which she had a right to rely after a marriage of 25 years and accordingly I respectfully dissent.

Although the judgment appealed from was entered prior to March 1, 1979, which was the effective date of Minn.Stat. § 518.-552, the majority emphasizes the fact the parties were willing to be bound by that amendment, and states that the amendment "effects a substantial change in the role of the courts" in awarding payments to a divorced spouse. I do not agree that Minn. Stat. § 518.552 (1978) effects a drastic change in the law of domestic relations. The statute calls for the trial court's consideration of "all relevant factors" in decisions regarding maintenance payments. Those articulated include not only the financial resources of the party seeking maintenance and the time necessary to find employment, but requires the trial court to consider the parties' standard of living, the duration of their marriage, the age, physical and emotional condition of the party seeking maintenance, and the other party's ability to make such payments.

Nor could appellant have anticipated that in the absence of explicit statutory language, abolishing prior criteria for awarding maintenance, this court would construe the statute to deprive her of rights she

---

**2.** Our recent decision in *Ruzic v. Ruzic,* 281 N.W.2d 502 (Minn.1979), while not decided under the provisions of 1978 Minn.Laws, ch. 722,

applied the standards adopted herein in affirming an award of alimony which was to terminate after six years.

might otherwise have expected. It is grossly unfair to assume she would stipulate to a statutory construction which would totally defeat her claims. If the statute works a substantial change in existing practice, then surely it is *ex post facto* with respect to this appellant, not only because her divorce decree was entered prior to the statute's date of effectiveness, but because she was married at a time when the prevailing social custom made her professional career subordinate to her husband's and required that she abandon a career to raise her son and keep house for her husband. This placed him under a corresponding duty to support her to the extent her earning capacity was permanently impaired. An award of permanent alimony is a substitute for his duty of support. *See Loth v. Loth*, 227 Minn. 387, 35 N.W.2d 542 (1949); *Wilcox v. Wilcox*, 222 Minn. 279, 24 N.W.2d 237 (1946). Recognizing a wife's contribution to her husband's career, this court has held that the support to which a divorced wife is entitled is not limited to that which will provide her with the bare necessities of life. She can expect a sum which will maintain her at a standard of living commensurate with what she and her husband enjoyed at the time of the dissolution. *Arundel v. Arundel*, 281 N.W.2d 663, 666–67 (Minn. 1977); *Cooper v. Cooper*, 298 Minn. 247, 214 N.W.2d 682 (1974); *Botkin v. Botkin*, 247 Minn. 25, 77 N.W.2d 172 (1956).

The parties were married in June 1954. Today, respondent, is a vice–president of Control Data Corporation, earning more than $120,000 per year. Appellant has not been employed since her son was born, at which time she abandoned a promising career as an executive secretary in order to fulfill the expected, traditional role of wife and hostess for a rising and successful business executive. She performed this role so well that in 1977 she was selected to serve as hostess to the board of directors of Control Data Corporation during a week–long meeting in Greece, which was her homeland and that of her husband. When her husband was being considered for his present position, appellant was herself interviewed to determine whether she could fill the role

required of her in her husband's business career. A number of years previously she had been anxious to resume a career of her own. Her husband forbade it stating that he was "not going to have any wife of mine pound a typewriter."

There is no evidentiary support for the trial court's finding that her earning capacity is substantial. There is no showing that at her age, now approximately forty–seven, she can be gainfully employed at her prior occupation after a lapse of more than twenty years. These factors have all been previously considered by our court. We stated in *Ruprecht v. Ruprecht*, 255 Minn. 80, 90, 96 N.W.2d 14, 23 (1959):

In exercising sound discretion the court may consider the ages of the parties and the earning ability of each; the conduct of their marriage and its duration; the station they occupy in life; the circumstances and necessities of each, the probability of continuing present employment into the future, as well as the capacity and ability to obtain new employment under changing circumstances and needs; the financial circumstances of the parties are shown by the property acquired, together with its value and income–producing capacity; the accumulated debts and liabilities if any; and all facts with respect to whether the property of the parties has been accumulated before or after marriage. The court may also consider all other matters disclosed by the evidence.

In *Arundel v. Arundel*, 281 N.W.2d 663 (Minn.1979); *Cashman v. Cashman*, 256 N.W.2d 640 (Minn.1977); and *Bollenbach v. Bollenbach*, 285 Minn. 418, 175 N.W.2d 148 (1970), we approved or required awards of alimony for an indefinite period, or in the alternative a substantial property division where the marriages were of long duration and the wives had abandoned potentially rewarding careers to devote their efforts to raising children and maintaining the family home. As we said in *Bollenbach*, "[the wife's] role in the particular situation of these parties was to expend her youth and intelligence and talents in the home and

with her children and in family–related activities of which her husband approved." 285 Minn. 431, 175 N.W.2d at 157. Mrs. Bollenbach also forfeited any opportunity to pursue a career when she was married and we noted it would be unlikely she could find a job "adequate to satisfy the demands of the style of life enjoyed for almost 20 years." *Id.* at 432, 175 N.W.2d at 157. Unlike the situation we faced in *Ruzic v. Ruzic*, 281 N.W.2d 502 (Minn.1979), here we have precise evidence regarding this husband's earning capacity while that of his wife is entirely speculative.

Accordingly, I would continue the $2,000 per month payment indefinitely, subject only to a substantial change in circumstances at some later date.

SHERAN, Chief Justice (dissenting).

I join in the dissent of Mr. Justice Otis.

WAHL, Justice (dissenting).

I join the dissent of Mr. Justice Otis. It is hard to believe that Mrs. Otis would willingly have agreed to have her case decided under Minn.Stat. § 518.552 had she known that the section would be interpreted, as the majority today interprets it, to effect a sharp change in existing law. The statute should not, as Justice Otis notes, effect such a change. All the factors which § 518.552 requires the trial court to consider in making maintenance payment decisions were identified as important by this court. Serious consideration of a number of the factors identified in § 518.552–the duration of the marriage, Mrs. Otis' age, physical and emotional condition, and Mr. Otis' ability to make payments–gravitate in favor of a permanent award for Mrs. Otis.